J-S34044-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROBERT GEORGE LEONARD, III | : | |
| | : | |
| Appellant | : | No. 577 MDA 2021 |

Appeal from the Judgment of Sentence Entered May 3, 2021
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s): CP-54-CR-0001364-2019

BEFORE: DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: **FILED: MARCH 22, 2022**

Robert George Leonard, III (Appellant) appeals from the judgment of sentence entered in the Schuylkill County Court of Common Pleas, following his jury convictions of third-degree murder, strangulation,[1] and related offenses, committed against his girlfriend. Appellant argues: (1) the trial court erred in precluding his cross-examination of the Commonwealth's expert witness, as to how methamphetamine could have affected the state of mind of the victim, and of individuals generally; and (2) his sentence for strangulation was illegal because it violated the merger doctrine and the Double Jeopardy clause. We affirm. We also grant the application of Appellant's counsel, assistant public defender John Fegley, Esquire, to

_____

[1] 18 Pa.C.S. §§ 2502(c), 2718(a)(1).

withdraw from representation on the ground he has accepted new employment.

## I. Facts & Procedural History

The evidence presented at Appellant's jury trial is generally not disputed. Appellant and his girlfriend, Terri Gee (the Victim), were

staying in a camper . . . in the Raush Creek Trailer Riders trailer park. On . . . January 5[, 2019,] at about 10:30 p.m., Appellant and [the Victim] were seen on the surveillance camera video at a truck stop not far from the campground, where Appellant showered and changed into camo pants.

There were also surveillance cameras near the campground office. At about 5:30 a.m. on January 6, Appellant could be seen on the surveillance camera tapes walking back and forth erratically and carrying a knife in his hand. Nicholas Bender, the campground director of operations, arrived at the office around 8:00 a.m. followed closely thereafter by [colleague] Jeanette Greenhouse[.] Bender and Greenhouse had not reviewed the surveillance tapes when Appellant came to the office. He was acting strange and appeared to be on something. Bender asked Appellant if everything was all right, and Appellant replied that he did not know. Greenhouse noticed blood on Appellant's camo pants and sneakers. When Greenhouse asked where [the Victim] was, [A]ppellant said [the Victim] had given the camper to her family and left two nights before.

Appellant went back to the campsite. When Bender passed by the site around 10:30 a.m., he saw [A]ppellant pacing back and forth in the bed of his pickup and "windmilling" his arms. The police were contacted to do a wellness check for [the Victim], but they did not respond. By now [A]ppellant was back at the office sitting on the porch.

Bender went to [A]ppellant's campsite and found [the Victim] in the front passenger seat of [A]ppellant's pickup. The truck was idling. Her T-shirt was covered with dried blood; her chest was moving up and down; and she was foaming at the mouth. Bender returned to the office and called 9-1-1. Appellant said he was glad Bender found her and that he did not know what happened. Then

- 2 -

he told Bender [the Victim] had killed her son and threatened to kill him if he told anyone. Appellant claimed that the son was in the back of the truck. Her son was not in the truck.

* * *

When asked by police about the blood stains on his pants and sneakers, Appellant claimed he cut his leg and rolled up his pants, but there was no cut. He acknowledged using methamphetamine. A pocket knife with dried blood on it was found in his front pants pocket. Laboratory tests confirmed that the blood on the knife, the blood on [A]ppellant's pants and the blood on his sneakers [were the Victim's].

Trooper Timothy Marcovich, a State Police drug recognition expert interviewed [A]ppellant . . . after he was arrested. He testified that [A]ppellant appeared to be under the influence of methamphetamine.

Trial Ct. Op., 6/15/21, at 2-4.

The Victim was transported to the hospital, and she died there three days later. Trial Ct. Op. at 3. Dr. Wayne Ross performed an autopsy. At trial, he testified, as a forensic pathology expert witness for the Commonwealth, to the following:

[The Victim] suffered multiple blunt force trauma to the head, two stab wounds to the neck, and both manual and ligature strangulation. [T]he traumatic injuries to her brain, the stab wounds to her neck, or the strangulation would each alone have been fatal.

*Id.* at 3.

Appellant was charged with murder of the first degree,[2] murder of the third degree, strangulation, aggravated assault with a deadly weapon,[3] and related offenses. The case proceeded to a multi-day jury trial commencing March 5, 2021.

Pertinent to Appellant's argument on appeal, we note a toxicology report for the Victim, reviewed by Dr. Ross, showed amphetamine and methamphetamine. **See** N.T. Trial Vol. III, 3/8/21, at 686.[4] At a lengthy, mid-trial side-bar discussion, Appellant sought to cross-examine Dr. Ross on the effect these substances **could** have had on the Victim's condition and state of mind. **Id.** at 531-34. Appellant acknowledged there was no eyewitness to the assault, but averred that because there was such a lack of evidence as to where or how the assault occurred, "the jury could make their own conclusions." **Id.** at 531, 532. Appellant further argued his proffered cross-examination would show how any person, who is under the influence of methamphetamine generally, could act. **Id.** at 531-33. He argued:

> [Methamphetamine] makes people aggressive. There [are] people who mutilate their own body or kill other people because

---

[2] 18 Pa.C.S. § 2502(a).

[3] 18 Pa.C.S. § 2702

[4] The certified record includes three volumes of trial testimony, entitled, respectively, Volume I, II, and III. Although each represents the proceedings of a separate day of trial, all three volumes state the same date, "March 8, 2021," on their cover pages. For consistency, we likewise include this March 8th date in our citations to the trial transcripts.

they're under such an influence of this methamphetamine. And [the Victim's] methamphetamine was substantial. It wasn't just a little bit. . . .

*Id.* at 532-33.

The trial court reasoned there was no evidence the Victim committed such actions, and indeed no evidence about her conduct or state of mind at all. N.T. Trial Vol. III at 531, 533. The court opined Appellant could not theorize, nor ask the jury to speculate, what the Victim **could** have done. *Id.* Any evidence pertaining to how the Victim could have acted was "[p]ure speculation." *Id.* at 532. Similarly, the court stated, any evidence of how other people may act under the influence of methamphetamine was speculative and irrelevant. *Id.* at 533-35.

In response, Appellant claimed "that is basically what [the Commonwealth is] doing," *i.e.*, it was attempting to show Appellant's behavior under the influence of methamphetamine. N.T. Trial Vol. III at 535-36. The trial court disagreed, pointing out the Commonwealth's evidence was relevant to show who stabbed the Victim, where it was shown she was mortally wounded: "That is not speculation. That is why it is different." *Id.* at 536. Ultimately, the court ruled that Appellant may ask Dr. Ross, "Were there any result[s] of toxicology reports?" *Id.* at 541. However, the court precluded Appellant from asking what effects methamphetamine may have had on the Victim. *Id.*

On cross-examination of Dr. Ross, Appellant elicited testimony that the Victim's toxicology report showed amphetamine and methamphetamine, specifically a blood level of 810 ng/ml of methamphetamine. N.T. Trial Vol. III at 686, 687. When asked whether this was amount was high, Dr. Ross responded, "It is a high level. She takes methamphetamine at the atomic level." *Id.* at 687. There were no further questions about this toxicology report.

Appellant presented exhibits, but did not call any witnesses nor testify on his own behalf. The jury found Appellant not guilty of murder of the first degree, but guilty of murder of the third degree, aggravated assault with a deadly weapon, aggravated assault,[5] strangulation, simple assault, possessing an instrument of a crime (PIC), and recklessly endangering another person (REAP).[6]

On May 3, 2021, the trial court conducted sentencing. Pertinently, the court found that strangulation and third degree-murder did not merge. The court imposed the following sentences: (1) for third-degree murder, 20 to 40 years' imprisonment; (2) for strangulation, a consecutive five to 10 years' imprisonment; and (3) for PIC, a consecutive 2.5 to five years' imprisonment.

---

[5] 18 Pa.C.S. § 2702(a)(1).

[6] 18 Pa.C.S. §§ 2701(a)(1), 907(b), 2705, respectively.

The court found simple assault, REAP, and the two counts of aggravated assault merged. Appellant's aggregate sentence was thus 27.5 to 55 years.

Appellant did not file a post-sentence motion, but took this timely appeal. He complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

## II. Statement of Questions Involved

1. Did the trial court err in limiting trial counsel's ability to elicit testimony from the Commonwealth's expert witness regarding information within his report about the levels of amphetamine and methamphetamine in the decedent's blood and the general effects those drugs have on an individual and thus effectively preclude [Appellant] from arguing self-defense or that the wounds the decedent suffered were self-inflicted?

2. Did the sentencing court impose an illegal sentence when it ordered the sentence on the charge of strangulation to run consecutively to the sentence for the charge of third-degree murder? Included in this question is whether the trial court erred in applying the statutory merger doctrine found at 42 Pa.C.S. § 9765 which is contrary to the broader merger doctrine drawn from the Pennsylvania Constitution's Double Jeopardy Clause.

Appellant's Brief at 4.

## III. Preclusion of Cross-Examination of Expert Witness

In his first issue, Appellant avers the trial court erred in barring him from examining the Commonwealth's expert witness about "the general effects [amphetamine and methamphetamine] have on an individual and thus effectively preclude [him] from arguing self-defense or that the wounds the [Victim] suffered were self-inflicted[.]" Appellant's Brief at 9.

We first note the relevant standard of review:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.

*Commonwealth v. Levanduski*, 907 A.2d 3, 13-14 (Pa. Super. 2006) (*en banc*) (citation omitted).

Appellant reiterates that he sought to introduce testimony from Dr. Ross, that the "ample amount of methamphetamine in [the Victim's] system . . . could cause changes in a person's mental capacity[,]" and "could make a person hallucinate, act aggressively, and mutilate her own body." Appellant's Brief at 10. Appellant challenges the trial court's finding "that this theory was speculative and that there was no evidence that the [Victim] actually acted in such a manner." *Id.* Instead, he emphasizes, "this proffered testimony **was** the evidence that gave an inference that the [Victim's] injuries were a result of self-mutilation and not from [Appellant's] actions." *Id.* at 11. Furthermore, Appellant claims that in "requiring affirmative proof that" something occurred, "the trial court applied the wrong legal standard for a defendant's admission of evidence." *Id.* at 11-12. Instead, he maintains, the proper standard for admitting a defendant's evidence is merely whether "the proffered testimony supported an inference." *Id.* at 12. Similarly, Appellant contends that "when an accused seeks to offer evidence that another person committed the acts, the question for admissibility is not whether there was affirmative proof that

the [Victim] inflicted the injuries upon herself," but rather "whether the proffered evidence ha[s] a tendency to make it more probable than less probable that the [Victim's] highly intoxicated state led to actions of self-mutilation[.]" *Id.* Finally, Appellant reasons that where the Commonwealth was permitted to present evidence that he was "acting erratically and under the influence of drugs[,]" he "was denied this same opportunity to present evidence that the [Victim] was also under the influence of a high amount of methamphetamine." *Id.* at 14. We determine no relief is due.

In its opinion, the trial court reiterated its reasons, stated at trial, for denying Appellant's proposed cross-examination:

> Although defense counsel was permitted to ask Dr. Ross about the level of amphetamine in the [V]ictim's system, she was not permitted to ask the witness to speculate about what the [V]ictim might had done because of the drugs. [C]ounsel intended to argue to the jury that Appellant may have acted in self-defense against a drug-induced attack by the [V]ictim or that [she] may have bludgeoned, stabbed and strangled herself. There was no evidence [the Victim] physically attacked [A]ppellant. Speculation about what a person might do with high levels of methamphetamine in her system is not evidence that anything occurred.

Trial Ct. Op. at 7. We agree the court's rationale, that the proffered testimony was both speculative and not relevant. *See* N.T. Trial Vol. III at 530-41.

While Appellant cites his own statement, at trial, that methamphetamine "could make a person hallucinate, act aggressively, and mutilate her own body," this statement was merely argument, not evidence. *See* Appellant's Brief at 10, *citing* N.T. Trial Vol. III at 532-33. The proposed cross

examination of the Commonwealth's expert witness **may** have been relevant if there were a witness who testified that the Victim repeatedly stabbed, hit, or strangled herself. However, without such evidence or at least a proffer of evidence, the trial court was correct in precluding this line of cross examination.

Appellant's comparison of his proposed evidence, about the effects of methamphetamine on Victim's condition and state of mind, to the Commonwealth's evidence about his own erratic behavior and methamphetamine use that evening, is meritless. As the trial court repeatedly pointed out at trial, there was independent evidence tending to show Appellant was the person who stabbed the Victim: surveillance video of them together, as well as of Appellant "walking back and forth erratically[,] carrying a knife in his hand[;]" blood on Appellant's pants and sneakers; a "knife with dried blood on it . . . found in [Appellant's] front pants pocket;" and a laboratory report confirming the blood on the knife and Appellant's pants and sneakers were the Victim's. Trial Ct. Op. at 2-4. This evidence contrasts with the utter lack of any evidence — conceded by Appellant — of the Victim's conduct, condition, or state of mind at the time of the assault. *See* N.T. Trial Vol. III at 531. Appellant wanted to make an issue of the Victim's conduct, but in the absence of evidence about the effect of methamphetamine on the Victim that night or perhaps in the past, the suggested cross-examination would have elicited speculative testimony, confused the issues, and misled the jury.

Furthermore, Appellant ignores Dr. Ross' testimony that the Victim sustained "only" one defensive wound, a bruise, on her left lower leg. N.T. Trial Vol. III at 646, 656, 685. "She had no stab wounds on her arms . . . but she had two clear stab wounds to the neck." *Id.* at 657. Dr. Ross opined: "The lack of several defensive wounds on her body" indicated the Victim was "either unconscious, significantly incapacitated, [and/or] significantly injured . . [a]s she [was] being assaulted." *Id.* at 656.

### IV. Claim of Illegal Sentence

In his second issue, Appellant avers his sentence for strangulation as illegal, both under the merger doctrine and Double Jeopardy jurisprudence.

We first note:

A claim that crimes should merge for sentencing purposes raises a non-waivable challenge to the legality of the sentence; thus, our standard of review is *de novo* and our scope of review is plenary.

\* \* \*

[W]hether two offenses merge for sentencing is governed by Section 9765 of the Sentencing Code, which states the following:

**§ 9765. Merger of sentences**

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and **all** of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765 (emphasis added).

*Commonwealth v. Edwards*, 256 A.3d 1130, 1136-37 (Pa. 2021).[7]

Furthermore, this Court has explained: "The protections afforded by double jeopardy [include] protection against multiple punishments for the same offense." *Robinson*, 166 A.3d at 1276 (citation omitted). As stated above, "Double Jeopardy claims 'implicate the fundamental legal authority of the court to impose the sentence that it did[.]'" *Id.*

Appellant was convicted of strangulation under the following subsection of our Crimes Code:

> A person commits the offense of strangulation if the person knowingly or intentionally impedes the breathing or circulation of the blood of another person by:
>
>    (1) applying pressure to the throat or neck[.]

*See* 18 Pa.C.S. § 2718(a)(1). Murder of the third degree is defined in relation to murder of the first and second degree:

---

[7] At the sentencing hearing, Appellant's counsel's objection to the strangulation sentence was limited to an argument that the sentence should run concurrent with, and not consecutive to, the sentence for third-degree murder. N.T. Sentencing, 5/3/21, at 11-12. Nevertheless, as stated above, a claim that a sentence "should merge for sentencing purposes raises a non-waivable challenge to the legality of the sentence." *Edwards*, 256 A.3d at 1136-37.

Similarly, while Appellant made no argument on double jeopardy grounds, this issue is not waived on appeal. *See Commonwealth v. Robinson*, 166 A.3d 1272, 1276 (Pa. Super. 2017) ("Double Jeopardy claims 'implicate the fundamental legal authority of the court to impose the sentence that it did' and, therefore, challenge the legality of the sentence imposed.").

> **(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
>
> **(b) Murder of the second degree.**—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.
>
> **(c) Murder of the third degree.**—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S. § 2502(a)-(c).

> On appeal, Appellant concedes that under the
>
> elements test [of] Section 9765, the crime[s] of strangulation and murder in the third degree do not merge as each has an element the other does not.
>
> Strangulation requires the intentional impeding of breath or circulation of blood through the application of pressure to the throat or neck. 18 Pa.C.S. § 2718(a)(1). Murder of the third degree is the malicious but unintentional killing of another person. **Commonwealth v. Packer**, [168 A.3d 161 (Pa. 2017).]

Appellant's Brief at 21-22 (paragraph break added).

However, Appellant relies, as he did before the trial court,[8] on the

Pennsylvania Supreme Court's grant of allowance of appeal in **Edwards**, 256

A.3d 1130, on the question of whether "Section 9765 has been interpreted in

an overly broad manner when applying the merger doctrine." Appellant's Brief

at 21. Appellant asserts: "**If**, in deciding **Edwards**, our Supreme Court

_____

[8] **See** Trial Ct. Op. at 6.

- 13 -

returns to its historical application of merger in the double jeopardy context, we would [argue Appellant] is being punished twice for the same criminal act." *Id.* at 22 (emphasis added).

On August 17, 2021, shortly after Appellant filed his brief with this Court, our Supreme Court issued a decision in ***Edwards***.[9] The Court acknowledged that "our merger doctrine has 'not [been] altogether harmonious[,]'" but held Section 9765 "has evidenced the Legislature's intent on how sentencing courts must proceed when faced with a merger issue." ***Edwards***, 256 A.3d at 1139. The Court thus concluded the Superior Court did not "construe the statute in an overly broad manner to bar merger," and declined to disturb the Pennsylvania courts' current interpretation of Section 9765. *Id.* at 1140. The Court stated that in applying Section 9765, "our analysis begins and ends with the statutory elements of each offense," and not "an evaluation of the specific facts as applied to the elements." *Id.* at

_____

[9] The question on which the Court granted allowance of appeal was:

> Did not the Superior Court err in construing 42 Pa.C.S. § 9765 in an overly broad manner to bar merger even though all of the elements of the [REAP] offense are contained within the elements of the statutory alternative of the Aggravated Assault offense for which [the defendant] was convicted?

***Edwards***, 256 A.3d at 1135. The defendant argued that "based on the specific facts under which he was convicted, the elements of REAP merge into the second statutory alternative under Section 2702(a)(1) for causing serious bodily injury." *Id.*

1137. As *Edwards* did not afford the relief anticipated by Appellant, we conclude no relief is due.

We address Appellant's additional assertions that "under an evidentiary approach, the act of strangulation would be the same act which caused the death of the [Victim]," and that separate sentences for strangulation and third-degree murder "punish[es] him twice for the same criminal act." *See* Appellant's Brief at 22-23. These arguments wholly ignore the trial court's discussion that regardless of the outcome in *Edwards*, Appellant's crimes did not "arise from a single criminal act:"

> There was not just one criminal act involved in the killing of [the Victim. A]ppellant bludgeoned her; he stabbed her twice in the throat; and he strangled her. It was not the accumulation of those injuries that caused her death. Dr. Ross testified that each of these acts, individually would have caused her death.

*See* Trial Ct. Op. at 6. *See also* 42 Pa.C.S. § 9765; *Edwards*, 256 A.3d at 1136-37. We agree. For the foregoing reasons, no sentencing relief is due.

## V. Counsel's Application to Withdraw from Representation

Appellant's counsel, Assistant Public Defender Fegley, has filed a praecipe to withdraw his appearance. Attorney Fegley avers that during the pendency of this appeal, he accepted new employment with the Bucks County District Attorney's Office. Counsel further explains that Appellant remains a client of the Schuylkill County Public Defender's Office and of Lora McDonald — whom we note represented Appellant at the pre-trial proceedings, trial, and sentencing. We grant Attorney Fegley's application for leave to withdraw.

## VI. Conclusion

We conclude no relief is due on Appellant's evidentiary or illegal sentence claims. We affirm the judgment of sentence, and we grant Attorney Fegley leave to withdraw from representation.

Judgment of sentence affirmed. Attorney Fegley's application to withdraw from representation granted.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/22/2022